# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-4000

UNITED STATES OF AMERICA *ex rel.*
DENISE CREWS & STATE OF ILLINOIS
*ex rel.* DENISE CREWS,

*Plaintiffs-Appellants,*

*v.*

NCS HEALTHCARE OF ILLINOIS, INC. &
NCS HEALTHCARE, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99 C 4020—**G. Patrick Murphy**, *Chief Judge.*

ARGUED FEBRUARY 13, 2006—DECIDED AUGUST 17, 2006

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.* Denise Crews filed suit against several related entities and individuals pursuant to the qui tam provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "FCA"), and the Illinois Whistleblower Reward and Protection Act, 740 ILCS § 175/1 *et seq.* Crews alleged that the various entities and individuals schemed to fraudulently obtain money from the Illinois Department of Public Aid (and indirectly, from the Social Security Administration) on a regular basis. The district court granted summary judgment for the defendants, explaining that

Crews did not point to any particular claim that was false. Crews suffers the same fate on appeal, and we affirm.

## I. HISTORY

Jeffrey Knute Connell owned and operated a shoddy pharmacy in Herrin, Illinois, that provided pharmaceutical services to nursing homes in the area. He later sold his business to NCS Healthcare, Inc. which later transferred ownership to its subsidiary, NCS Healthcare of Illinois, Inc. (collectively, "NCS"). Connell remained as Pharmacist-in-Charge.

NCS hired pharmacists (including Denise Crews) and pharmaceutical technicians to fill and deliver prescriptions. Approximately 60% of the nursing home patients were on Illinois Medicaid. Illinois Medicaid is jointly funded by the State of Illinois and the Social Security Administration, and administered by the Illinois Department of Public Aid (the "IDPA"). NCS would submit vouchers to the IDPA for payment for those drugs distributed to Illinois Medicaid patients.

Prescriptions were typically filled by a machine. The machine, of course, was not perfect. Occasionally, the machine would package too many or too few pills, for example. Employees would manually add, remove, or replace pills as needed. They did this using piles of pills they kept on their desk or in their desk drawers. By not properly storing the pills, NCS was violating state law. Furthermore, NCS was violating state and federal law by mixing together pills with different expiration dates.

For various reasons, prescriptions would often return to NCS unused, such as when a patient died. In that case, employees simply dumped the unused pills in large garbage cans, separated by drug type. When filling prescriptions with the machine, employees would sometimes take drugs from the garbage cans and load the machine with these

pills. Here again, the storage of the pills was improper, as was the label on the final packages, as the expiration dates would not be accurate.

In 1998, the pharmacy was raided by law enforcement personnel pursuant to a search warrant. Ultimately, Connell, another pharmacist, and NCS pled guilty to one count of misbranding drugs under the federal Food, Drug and Cosmetic Act, for the repackaging and recycling of drugs without regard to lot numbers or expiration dates. *See* 21 U.S.C. §§ 331(b),(k), 333(a)(1). Connell also pled guilty to causing an employee to submit a false certification in connection with federal regulations regarding the storage and handling of controlled substances. *See* 18 U.S.C. §§ 1001, 2. Connell was sentenced to prison while NCS was ordered to pay $200,000 in restitution.

Crews filed her qui tam suit in 1999. In effect, Crews attempted to be a whistleblower a full year after law enforcement raided the pharmacy, and two years after she stopped working there. It is unclear from the record what new or additional information, if any, Crews brought to the table. Crews's complaint alleged NCS submitted false claims to the IDPA by submitting claims for medications that had been recycled, repackaged, and previously paid for by Illinois Medicaid for another patient. She further alleged that NCS resold medications that had been returned by nursing homes without crediting the IDPA for the returned medications. She also alleged NCS submitted false claims by dispensing medication without regard for expiration dates and lot numbers.

## II. ANALYSIS

We review a district court's grant of summary judgment de novo. *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 793 (7th Cir. 2005) (citation omitted). Summary judgment is appropriate if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)); *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005) (citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"A qui tam action is brought by a private party, called the 'relator,' on behalf of the government." *United States ex rel. Lu v. Ou*, 368 F.3d 773, 774 (7th Cir. 2004). For our purposes, the FCA imposes liability against any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

31 U.S.C. § 3729(a)(1)-(3); *see United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (citation omitted). We need only concern ourselves with § 3729(a)(2),[1] which "has three essential elements: (1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *Gross*, 415 F.3d at 604 (citations omitted).

---

[1] Although Crews based her federal claim on § 3729(a)(1)-(3), we will ignore her claim based on subsection (1), as it is undisputed at summary judgment that NCS never filed any claim with an officer or employee of the United States. Rather, all claims were filed with and administered by the State. As for § 3729(a)(3), Crews apparently abandoned this claim, as this subsection (and any related argument) appear nowhere in her opening brief.

### *A. False Claims Involving Recycled Medications*

Crews's overarching argument is that "[a]ll claims for recycled and redispsensed [sic] medications submitted by NCS [ ] are false claims." Crews repeatedly points out that NCS provided prescription medication to nursing home residents, 60% of whom were on Medicaid. Furthermore, 10% to 20% of the dispensed medications were returned unused by the patients. Therefore, according to Crews, "basic math proves that 6% to 12% of recycled drugs would have been [re]distributed to Medicaid recipients [and thus rebilled to IDPA]." NCS frames the issue as follows: "Whether a failure by Plaintiff to tie one particular recycled medication to a particular false claim is fatal to a cause of action under the False Claims Act . . . ."

Three other courts of appeals have faced this same issue, one of which involved virtually identical circumstances. *See United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432 (3d Cir. 2004); *United States ex rel. Clausen v. Lab Corp. of Am, Inc.*, 290 F.3d 1301 (11th Cir. 2002); *United States ex rel. Alfatooni v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir. 2002). All three are in agreement, in that the respective relators' claims failed because each relator did not provide a single false claim that was actually submitted. In *Quinn*, the Third Circuit reasoned as follows:

> Quinn . . . did not come forward with a single claim that [the pharmacy] actually submitted to Medicaid which covered a medication for which [the pharmacy] had previously submitted a claim. . . . Quinn failed to link [the pharmacy]'s recycling and crediting practices to the actual submission of a false claim. Without proof of an actual claim, there is no issue of material fact to be decided by a jury. Quinn's theory that the claims 'must have been' submitted cannot survive a motion for summary judgment.

382 F.3d at 440; *see Clausen*, 290 F.3d at 1311 (holding plaintiff cannot "merely . . . describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government"); *Alfatooni*, 314 F.3d at 1002-03 (holding plaintiff must come to court with a "claim in hand" and "generalized, speculative suppositions" will not suffice). Furthermore, the Third Circuit agreed with the statement that the relator has the "burden to establish, in at least one instance, that a given pharmaceutical had been paid for by Medicaid, returned to the pharmacy, and then redispensed and rebilled to Medicaid." *Quinn*, 382 F.3d at 440. We agree with the analysis from *Quinn*, and find Crews did not meet her burden.

In an effort to circumvent the reasonings from *Quinn*, *Clausen*, and *Alfatooni*, Crews attempts two contradictory arguments. On the one hand, Crews points to IDPA Voucher Number 6306580 as evidence of a false claim. On the other hand, Crews argues she need not tie a recycled pill to a particular claim because "such a showing is impossible," given NCS's contamination of the evidence; therefore, the burden is on NCS to show its actions were legal, or so the argument goes. We first turn to the Voucher.

At the outset, we note Crews points to only one voucher. Given the analysis above, Crews needs to point to at least two vouchers to meet her burden: one voucher in which the IDPA is billed for certain pills, and then a second voucher in which the IDPA is billed again for at least one of the same pills. Without more, the Voucher standing alone proves nothing. Crews's original claim is akin to alleging the double-billing of the IDPA (and Medicaid) for drugs. Another bill submitted to the IDPA for the same pills is required; otherwise, it could be that the pills from the Voucher were later returned, distributed to a non-Medicaid patient, and billed to that patient's insurance company. In

that case, Crews would have no case under the FCA. For that matter, simply by chance, all recycled drugs could have wound up in the hands of non-Medicaid patients. Statistically unlikely, to be sure, but possible. In fact, Crews introduces no evidence that that is not what happened. The burden is on Crews to show the link between two vouchers that represent two separate charges for the same pill, a burden Crews fails to carry.

Crews's failure to point to two vouchers brings us to her second argument, namely that the burden of proof is on NCS, as it was responsible for contaminating the evidence. Crews has no case law legitimately supporting her position. The cases she does cite involve retaliatory discharge claims, as well as securities, unfair trade, and antitrust cases. The securities, unfair trade, and antitrust cases all involve the determination of damages, and are of no relevance here. As for the retaliatory discharge cases, they too have no relevance in this case, as they involve a specific burden-shifting method that shifts the burden of production to a defendant *after a plaintiff has met his*, something we do not have here. Crews does not point to one relevant case under the FCA that shifted the burden of actually identifying a false claim from the relator to the defendant. In effect, Crews is arguing that NCS must prove that each and every claim it ever filed with the IDPA was lawful, an argument that defies common sense and the plain language of the FCA.

This is not a case in which a defendant began destroying evidence during discovery in an effort to thwart discovery. Nor is it the case of employees in a backroom, shredding documents due to a threat of potential litigation. At worst, NCS was a criminal enterprise that kept poor records. There is simply no legal authority under the FCA for the proposition that Crews's burden of proof must then be shifted to NCS as a result.

### B. False Claims Involving Returned Medications

Crews also claims that "[a]ll claims submitted to Illinois Medicaid by NCS [ ] for medications returned by the Medicaid recipient are false claims." As support, Crews points to undisputed evidence indicating that 10% to 20% of the medication dispensed by NCS was returned. Crews argues (without a citation to the record) that no credits were provided to IDPA (or Medicaid) for these unused medications. Therefore, according to Crews, 10% to 20% of all claims submitted were false claims. Here again, Crews fails to point to a specific voucher, one which billed for drugs that were later returned, with no credit given. Crews's utter lack of evidence is underscored by the fact that it is entirely possible that all returned drugs were from non-Medicaid patients; there is no evidence to the contrary. Once again, Crews's argument is similar to that made in *Quinn*, *Clausen*, and *Alfatooni*, in that some of the vouchers must have been false, and for the reasons set forth earlier, we reject this line of argument.

As for Crews's federal claim on this issue, a similar argument was specifically rejected by the Third Circuit in *Quinn*. The court found "that there [was] no regulatory requirement of the reversal of a claim once a medication [had] been returned." *Quinn*, 382 F.3d at 438. Therefore, "if there is no requirement to adjust the claim, there is no liability for a failure to do so." *Id.* As Crews fails to point to a federal regulatory requirement here, we agree with this analysis. Furthermore, we agree with the second line of reasoning from *Quinn* rejecting this argument, namely that the claim was not false when filed.[2] *Id.* ("The fallacy of this argument lies in the fact that the return of a medication,

---

[2] Although Crews does point to a state regulatory requirement, namely 89 Ill. Adm. Code § 140.448, this does not save the day for her, as the second line of reasoning from *Quinn* still holds true to undercut her state law claim.

which at the outset has been dispensed to the Medicaid beneficiary, does not render the initial claim false or fraudulent.").

We also note a theoretical problem with Crews's claim that there were false claims on account of NCS failing to provide credit for returned medications. The problem is that Crews can never point to a specific voucher on this issue; effectively, Crews's claim is a failure-to-file claim—NCS failed to file a revised voucher or claim that credited IDPA for the returned medications. This failure-to-file claim necessarily precludes a FCA action, as that Act specifically requires a claimant to point to a specific claim.

### C. False Claims Involving False Certifications

The last argument we need address is Crews's contention that the Voucher constitutes a false claim because Connell was convicted of making a false statement with respect to the Voucher. Connell pled guilty to making a false statement, as he failed to disclose that NCS did not comply with federal regulations regarding the storage and handling of controlled substances, in violation of 18 U.S.C. §§ 1001 and 2. Connell's conviction simply does not stand for the proposition Crews is attempting to advance. Crews's argument reads as if Connell pled guilty to submitting a false claim, which is not the case. The Voucher does not turn into a false claim under the FCA just because NCS stored or handled the drugs improperly. Besides, "[a]n FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements also requires that the certification of compliance be a condition of or prerequisite to government payment." *Gross*, 415 F.3d at 604 (citations omitted). Crews does not introduce any actual, relevant evidence on this issue.

## III.  CONCLUSION

For the reasons set forth above, the decision of the district court is AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*