In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 13-1886 & 13-1936

UNITED STATES OF AMERICA ex rel.
VANESSA ABSHER, et al.,

*Plaintiffs-Appellees, Cross-Appellants,*

*v.*

MOMENCE MEADOWS NURSING
CENTER, INC. and JACOB GRAFF,

*Defendants-Appellants, Cross-Appellees.*

Appeals from the United States District Court for the
Central District of Illinois.
No. 04-CV-02289 — **Harold A. Baker**, *Judge.*

ARGUED JANUARY 9, 2014 — DECIDED AUGUST 20, 2014

Before MANION and SYKES, *Circuit Judges*, and GRIESBACH,[*]
*District Judge*.

MANION, *Circuit Judge.* This appeal and cross-appeal arise
from jury verdicts and a judgment against Momence Meadows

---

[*]   Hon. William C. Griesbach, Chief Judge for the Eastern District of
Wisconsin, sitting by designation.

Nursing Center, Inc., and its president and part owner, Jacob Graff.[1] The plaintiffs and cross-appellants are two nurses who were formerly employed by Momence. The nurses alleged that, during their employment at Momence, they uncovered evidence that Momence knowingly submitted "thousands of false claims to the Medicare and Medicaid programs" in violation of the False Claims Act ("FCA") and the Illinois Whistleblower Reward and Protection Act ("IWRPA"). The nurses filed this *qui tam* action on behalf of the government. They also sued in their personal capacities and alleged that Momence retaliated against them for reporting evidence of Momence's fraud.

Following trial, a jury reached verdicts against Momence on both the *qui tam* claims and the retaliation claims. The jury awarded the United States over $3 million in compensatory damages and imposed about $19 million in fines for the *qui tam* claims. Pursuant to the FCA, the compensatory damages were trebled to over $9 million. However, the district court set aside the fines on the grounds that they violated the Excessive Fines Clause of the Eighth Amendment. The jury also awarded the nurses $150,000 and $262,320, respectively, on their retaliation claims.

On appeal, Momence contends that the district court lacked jurisdiction over the *qui tam* claims, and that the *qui tam* and the retaliation claims fail as a matter of law. With support from the United States as *amicus curiae*, the nurses cross-appeal the set-aside of the fines. For the reasons discussed below, we

---

[1]  For simplicity's sake, we refer to both defendants as "Momence."

vacate the judgment, and remand with directions that judgment be entered for the defendants.

## I. Facts

The FCA prohibits any person from knowingly submitting a false or fraudulent claim to the United States for payment or approval or knowingly making any false statement material to such a false or fraudulent claim. 31 U.S.C. § 3729(a).[2] Civil penalties and treble damages are available remedies for each violation. *Id.* The Attorney General may bring actions under the FCA directly in the name of the United States. *Id.* Alternatively, a private person—known as a "relator"—may bring a *qui tam* action "for the person and for the United States Government." 31 U.S.C. § 3730(b)(1); *see U.S. ex rel. Eisenstein* v. *City of N.Y.*, 556 U.S. 928, 932 (2009). If such a *qui tam* action results in a recovery for the government, the relator shares in the award. *See* 31 U.S.C. § 3730(d).

During the time period relevant to the instant action (1998–2006), Momence owned a 140-bed long-term care facility located in Kankakee County, Illinois. Jacob Graff, Momence's president and part owner, was the "designated person[] functioning as [Momence's] governing body." *See* 42 C.F.R. § 483.75(d); A-913. Thus, he was legally responsible "for establishing and implementing policies regarding the management and operation of the facility." 42 C.F.R. § 483.75(d). He

---

[2]   The statutory language was altered—and the precise subsection was renumbered—after the relators brought this action, but the changes are not material to this appeal. *Compare* 31 U.S.C. § 3729(a) (2003) *with* 31 U.S.C. § 3729(a) (Supp. 2014).

also appointed the administrators who were responsible for managing the facility. *Id.*

At the time, almost all of Momence's residents were supported by Medicare or Medicaid. Both programs reimbursed Momence on a "per patient day" basis, meaning that the programs paid Momence a flat per diem amount for each resident and did not reimburse the facility separately for specific services provided. A-257–59. To receive reimbursement, Momence was required to provide government regulators with a completed Minimum Data Sheet ("MDS") form on behalf of each resident.[3] A-257, 734–43. The form is both a billing document and a care assessment certification for Medicare and Medicaid, and had to be submitted at 5-, 14-, 30-, 60- and 90-day intervals after admission. A-258, 891. The MDS forms used by Momence were lengthy and contained sections for inputting health assessment and tracking information for the patient, including disease diagnoses and health conditions, *inter alia*. A-734–40. Each form contained the following text:

> *I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for assuring that residents receive appropriate and*

---

[3] At trial, the relators introduced one blank MDS form, but did not introduce billing records for any of the individual residents at Momence.

> *quality care and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government funded health care program is conditioned on the accuracy and truthfulness of this information and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information.*

A-734; *see also* A-952.

Momence (as a long-term care facility caring for Medicare or Medicaid patients) also was required to comply with a wide variety of regulations and standards of care that are part of Medicare and Medicaid's complex regulatory scheme. *See* 42 C.F.R. pt. 483; Ill. Admin. Code tit. 77, subch. C, pt. 300. This regulatory scheme is enforced by the Centers for Medicare & Medicaid Services ("CMS"), a federal agency, and the Illinois Department of Public Health ("IDPH"). Under the regulations, a facility provides deficient or non-compliant care when the care does not meet a participation requirement specified in the controlling statutes or regulations. *See* 42 C.F.R. § 488.301. The provision of non-compliant care can result in a variety of remedies or sanctions, including fines or even termination from the Medicare and Medicaid programs. *See* 42 C.F.R. §§ 488.406, 488.408. Additionally, payments may be suspended if there are credible allegations of fraud against a facility. 42 C.F.R. § 405.371. To ensure that Momence was providing adequate care, the facility was subject to inspection ("surveys") by government regulators. *See* A-712–16. Between 1998 and 2006, government regulators surveyed Momence 117 times. A-551.

When deficiencies were discovered, the regulators required Momence to take remedial action, which involved completing and implementing plans of correction, and to pay administrative fines.

Vanessa Absher and Lynda Mitchell—the "relators"—are nurses who were formerly employed at Momence's nursing facility. Absher, a licensed practical nurse, worked for Momence from December 1997 to February 2003 (with some breaks in between). A-297. On February 8, 2003, Absher resigned her position with Momence. A-372. Mitchell, a registered nurse, worked for Momence from the beginning of 2001 to 2003. A-93. In February 2003, Momence terminated Mitchell's employment. A-93.

On September 29, 2004,[4] the relators filed this action and alleged that Momence knowingly submitted "thousands of false claims to the Medicare and Medicaid programs" in violation of the FCA, 31 U.S.C. § 3729 *et seq.*, and the IWRPA, 740 ILCS 175/1 *et seq.* (1993, *amended and re-codified* 2010).[5]

---

[4]  The operative complaint (the relators' sixth amended complaint) was filed in 2009 and extended the time period covered by the relators' *qui tam* claims through 2006, and alleged violations beginning as far back as 1989.

[5]  The IWRPA closely mirrors the FCA, and the parties do not contend that there are any differences between these statutes that are material to the parties' arguments or the relators' claims in this case. *See Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 557 (Ill. 2005); *see also U.S. ex rel. Humphrey v. Franklin-Williamson Human Servs., Inc.*, 189 F. Supp. 2d 862, 867 (S.D. Ill. 2002) (noting that the IWRPA "is virtually identical in all relevant aspects to the FCA"). After this action was filed, the IWRPA was amended and

(continued...)

Relators alleged that Momence also violated these statutes by retaliating against them by terminating Mitchell and constructively terminating Absher for reporting evidence of Momence's fraud. Pursuant to the FCA, the relators' complaint was filed under seal to allow the government the opportunity to intervene. 31 U.S.C. § 3730(b)(2). The United States and Illinois declined to intervene, and so the district court unsealed the relators' complaint and allowed the lawsuit to proceed.[6] Thereafter, Momence moved for summary judgment, but the district court denied that motion.

At trial, the relators presented evidence of numerous instances of non-compliant care provided at Momence and harm that resulted therefrom. Specifically, they presented evidence of problems relating to infection and pest control (including scabies[7] outbreaks), pressure sore management, medication, food and water temperatures, the facility's

---

[5] (...continued)

re-codified effective July 27, 2010, and now is known as the Illinois False Claims Act. *See* 740 ILCS 175/1 (2010).

[6] In *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689 (7th Cir. 2009), we held that Momence's insurer had no duty to defend against the action that ultimately matured into the judgment we consider in the present appeal. In that decision, "[w]e t[ook] no position on the merits of the underlying suit's FCA and IWRPA claims." *Id.* at 695 n.7.

[7] Scabies is "[a] parasitic infestation that causes intense itching and a rash." American Medical Association, *Complete Medical Encyclopedia* 1091 (2003) (noting that "[c]hildren and elderly people in nursing homes are particularly susceptible" to scabies).

cleanliness, wheelchairs and other medical equipment, accidents such as falls, and patient trust accounts. The relators also offered evidence of incidents where an administrator struck a resident, a resident wandered away from the facility, a resident was scalded in a bath, and a resident died from malfunction of his colostomy bag. Additionally, the relators offered expert witness testimony that Momence systemically violated Medicare and Medicaid regulations concerning the duties of personnel at the facility, the protocols for addressing patient care issues, and the standard of care provided. A-907–21 (Arbeit); A-988–1003 (Warner-Maron).

The relators also presented evidence that Momence actively concealed the extent of its non-compliant care from government regulators. Specifically, the relators offered testimony at trial that Momence supervisors directed employees not to chart symptoms of scabies or pressure ulcers (or, at least, to chart the symptoms as something other than scabies or pressure ulcers), and hid any charts where such symptoms had been documented. *See* A-206; A-227; A-898, at pp. 9–10. The relators also offered testimony that Momence generally was under-staffed and did not use proper blankets, pajamas, nightgowns, diapers, or briefs, yet would increase staffing levels and temporarily use new linens and nightgowns while government surveyors were present. A-99–100, 107–09, 150–53, 934. Additionally, during unscheduled surveys, Momence's administrator would broadcast a coded message to alert staff to the presence of regulators. A-964, 980.

At the close of the evidence, Momence moved for judgment as a matter of law, but the district court denied that motion. After deliberating, the jury concluded that Momence submitted

1,729 false claims, imposed an $11,000 penalty for each false claim (amounting to $19,019,000 in fines), and awarded compensatory damages in the amount of $3,030,409. The jury also awarded $150,000 to Absher and $262,320 to Mitchell on their retaliation counts. The district court entered judgment for the United States in the amount of $9,091,227, trebling the damages award, but vacated the statutory penalties, concluding that they violated the Eighth Amendment's Excessive Fines clause. The district court awarded nothing to Illinois. Momence moved for a new trial and renewed its motion for judgment as a matter of law. The district court denied those motions as well as the relators' motion to amend the judgment to reimpose the statutory penalties.

Momence appeals and contends that the district court lacked subject-matter jurisdiction over the *qui tam* claims, and that the *qui tam* as well as the retaliation claims fail as a matter of law. The relators cross-appeal the district court's decision to vacate the statutory penalties. The government filed an *amicus curiae* brief in support of the relators' cross-appeal.

## II. Jurisdiction

On appeal, Momence first argues that two statutory provisions contained in the FCA action deprived the district court of jurisdiction over the relators' FCA claims. *See* 31 U.S.C. § 3730(e)(3), (e)(4). In 2007, the Supreme Court held that one of these provisions, § 3730(e)(4), is a jurisdictional requirement that must be addressed before a court can reach the merits of the FCA claims. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467–70 (2007) ("we may, and indeed must, decide whether [the FCA plaintiff] met the jurisdictional requirement"); *Fednav*

*Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 837 (7th Cir. 2010) ("'we
are bound to evaluate our own jurisdiction, as well as the
jurisdiction of the court below'" (quoting *Int'l Union of Operat-
ing Eng'rs, Local 150 v. Ward*, 563 F.3d 276, 282 (7th Cir. 2009))).[8]
The Supreme Court's reasoning was based on the fact that, at
the time, § 3730(e)(4) contained the language "'[n]o court shall
have jurisdiction over an action under this section … .'"
*Rockwell*, 349 U.S. at 467 (quoting 31 U.S.C. 3730(e)(4)(A)).

However, in 2010, § 3730(e)(4) was amended and the
quoted language was replaced with the following language:
"The court shall dismiss an action or claim under this section
… ." *See* The Patient Protection and Affordable Care Act, Pub.
L. No. 111-148, 124 Stat. 119 (2010); *U.S. ex rel. Heath v. Wis.
Bell*, No. 12-3383, 2014 WL 3704023, at \*2 n.1 (7th Cir. Jul. 28,
2014). So it is no longer clear that *Rockwell*'s holding is still
good law. Regardless, the 2010 amendments to § 3730(e)(4) are
not retroactive. *Heath*, No. 12-3383, 2014 WL 3704023, at \*2 n.1
(citing *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885,
1889 (2011)). Thus, because the conduct underlying this action
and the filing of the action itself all occurred well before the
2010 amendments to § 3730(e)(4), we apply that section as it

---

[8]  Before *Rockwell*, we remarked in *dicta* that the Supreme Court had held
that § 3730(e)(4) presents issues of substantive law *rather* than jurisdiction.
*U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 494 (7th Cir. 2003)
(citing *Hughes Aircraft Co. v. United States*, 520 U.S. 939, 950–51 (1997)). But
the Court actually said that the bar speaks "not *just* to the power of a
particular court [*i.e.*, jurisdiction] but to the substantive rights of the parties
*as well*." *Hughes*, 520 U.S. at 951 (emphasis added). Regardless, *Rockwell*
made clear that § 3730(e)(4) must be addressed before a court can reach the
merits of the underlying FCA claims. 549 U.S. at 467–70.

existed before 2010. Consequently, *Rockwell* compels us to address whether § 3730(e)(4) bars the relators' *qui tam* claims before addressing the merits of those claims.

However, there is an additional wrinkle: Momence also invokes § 3730(e)(3) as a jurisdictional limit on the district court's power to entertain the relators' *qui tam* claims. But § 3730(e)(3) does not contain the language relied upon by *Rockwell* in concluding that § 3730(e)(4) was jurisdictional. (Section 3730(e)(3) was untouched by the 2010 amendments.) So it is not clear that § 3730(e)(3) imposes a true jurisdictional limitation. Regardless, as discussed below, Momence's argument based on § 3730(e)(3) fails for the same reason that the argument based on § 3730(e)(4)—which we clearly must address—fails.

Prior to the 2010 amendments, § 3730(e)(4) provided:

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an

action under this section which is based on the information.

(Footnote omitted). Thus, under § 3730(e)(4), the district court must determine whether the relators' allegations have been "publically disclosed," and whether the *qui tam* action is "based upon" those publically disclosed allegations. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). If so, § 3730(e)(4) will preclude the action unless "the relator is an 'original source' of the information upon which his lawsuit is based." *Id.*

Section 3730(e)(3) provides: "In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."

We review *de novo* challenges made pursuant to the FCA's bars. *U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 494–95 (7th Cir. 2003). But we review findings of fact considered in determining jurisdiction only for clear error. *Bowyer v. Dep't of Airforce,* 875 F.2d 632, 636 (7th Cir. 1989). "At each stage of the jurisdictional analysis, the [relators bear] the burden of proof." *Glaser*, 570 F.3d at 913; *see also* John T. Boese, *Civil False Claims and* Qui Tam *Actions* §4.02[A], at 4-56 (4th ed. Supp. 2014) ("Relators bear the burden of proving on a claim-by-claim basis that subject-matter jurisdiction exists by a preponderance of the evidence.").

Both § 3730(e)(3) and § 3730(e)(4) share a common feature—the phrase "allegations or transaction." These statutory bars operate only when the *qui tam* FCA action is

"based upon allegations or transactions" which either are the subject of a governmental civil action or penalty proceeding, § 3730(e)(3), or already have been "publically disclosed," § 3730(e)(4). Although we have never had occasion to interpret the phrase "allegations or transactions" within the meaning of these sections of the FCA, the District of Columbia Circuit has held that the phrase refers to allegations or transactions *of fraudulent conduct*. *U.S. ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653–54 (D.C. Cir. 1994). The other circuits to interpret the phrase "allegations or transactions" have come to the same conclusion. *See U.S. ex rel. Found. Aiding The Elderly v. Horizon W.*, 265 F.3d 1011, 1015 (9th Cir. 2001) (adopting *Quinn*'s analysis); *U.S. ex rel. Dunleavy v. Cnty. of Del.*, 123 F.3d 734, 741 (3d Cir. 1997) (same), *abrogated on other grounds by Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280 (2010); *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 676 (8th Cir. 1998) ("The present suit is based upon allegations *of fraud* involving the submission of false claims for payment for environmental remediation work completed at the Vertac site. Such allegations or transactions have never before been the subject of a FCA suit or any other suit or proceeding brought by the government or anyone else." (emphasis added)).[9] Thus, the two bars "prohibit *qui tam* actions *only*

---

[9]   In declining to apply § 3730(e)(3), the First Circuit observed that the government had "not proceed[ed] against the defendants to this action, for fraud *or otherwise* … ." *U.S. ex rel. S. Prawer & Co. v. Fleet Bank of Maine*, 24 F.3d 320, 328 (1st Cir. 1994) (emphasis added). It appears that the First Circuit is merely emphasizing that the government had not proceeded

(continued...)

when either the allegation of fraud or the critical elements of
the fraudulent transaction themselves" are the subject of a
governmental civil action or penalty proceeding or already
have been "publically disclosed." *Quinn*, 14 F.3d at 654. If an
allegation of fraud has already been made, the analysis is
straightforward. But even if no allegation of fraud has been
made, the bars contained in § 3730(e)(3) and § 3730(e)(4) may
still apply so long as facts disclosing the fraud itself are in the
government's possession or the public domain. In this latter
case, the court must determine whether facts establishing the
essential elements of fraud—and, consequently, providing a
basis for the inference that "fraud has been committed"—are
in the government's possession or the public domain. *Id.*

Here, no prior allegations of fraud—arising from the
provision of non-compliant care at the facility—had been
leveled against Momence (either by the government or other
publically disclosed source). However, as Momence contends,
the relators' FCA claims were based extensively upon incidents
of non-compliant care documented in government survey
reports that gave rise to administrative penalty proceedings.
Specifically, after a November 1998 survey revealed issues with
resident hygiene and pressure sore management, Momence
developed a plan of correction and was found to have resolved
the issue by February 1999. To remedy the interim period,
IDPH imposed civil monetary penalties of $4,850 and $3,050.
Likewise, after a March 2003 report found issues with scabies
and infection control, Momence adopted a new infection

---

[9] (...continued)
against the defendant *in any way*.

control policy and assessed all residents for possible skin problems. In April 2003, the facility was found to have resolved the problem. In addition to the monetary penalties already mentioned, IDPH imposed a penalty of $50 per day for the period from July 16, 2003, through September 26, 2003, and CMS imposed a penalty of $2,600 for the period from May 6, 2005, through May 18, 2005. In addition, for violations found on February 16, 2006, CMS imposed a penalty of $5,000, while IDPH imposed a separate penalty of $10,000.

Momence contends that these facts tend to establish one of the essential elements of fraud—namely, that Momence provided non-compliant care to its residents—and were already "publically disclosed" (within the meaning of § 3730(e)(4)(A)) prior to the relators filing this action. *See Graham Cnty.*, 559 U.S. at 283 ("The question before us is whether the reference to 'administrative' reports, audits, and investigations in [§ 3730(e)(4)(A)] encompasses disclosures made in state and local sources as well as federal sources. We hold that it does."); *Feingold*, 324 F.3d at 496 ("Administrative reports are publicly disclosed because, by their very nature, they establish the relevant agency's awareness of the information in those reports."). And these facts were the subject of administrative penalty proceedings within the meaning of § 3730(e)(3).

However, the relators also offered evidence that Momence refused to chart incidents of scabies, pressure ulcers, and rashes. Momence does not offer evidence that the government survey reports disclosed this misconduct. Moreover, the surveys' disclosure of Momence's provision of non-compliant care and the related administrative penalty proceedings are not

enough to trigger either § 3730(e)(3) or § 3730(e)(4) because the surveys did not disclose facts establishing that Momence misrepresented the standard of care in submitting claims for payment to the government. *See Horizon W.*, 265 F.3d at 1016 ("[T]he surveys must disclose both 'a misrepresented state of facts and a true state of facts.'" (quoting *Quinn*, 14 F.3d at 655)). The government survey reports do not disclose this essential element of a fraud claim under the FCA.[10] Therefore, the relators' FCA claims are not barred by § 3730(e)(3) or § 3730(e)(4). *See Horizon W.*, 265 F.3d at 1016–17.

### III. *Qui Tam* **Claims**

Momence also argues that the relators' *qui tam* claims fail as a matter of law. We review a district court's ruling on a motion for judgment as a matter of law *de novo*. *May v. Chrysler Grp., LLC*, 716 F.3d 963, 970 (7th Cir. 2013). The jury found in the relators' favor, so we must determine whether the jury had a legally sufficient evidentiary basis for its verdict. *Id.* at 971. In making this determination, we must construe the evidence in

---

[10]  Of course, as soon as the government learned that Momence was providing non-compliant care, it necessarily knew that at least some of Momence's claims for payment were for the provision of non-compliant care. *See Quinn*, 14 F.3d at 656 ("Knowledge of the allegedly misrepresented state of affairs—which does not necessarily entail knowledge of the fact of misrepresentation—is always in the possession of the government."). But this is not enough. The government must also have access to facts disclosing that Momence had the scienter required by the FCA. *See id.* ("[T]he entire *qui tam* regime is premised on the idea that the government's knowledge of misrepresented claims against the federal fisc (without knowledge that they are misrepresented) does not in itself translate into effective enforcement of the laws against fraud."); *Horizon W.*, 265 F.3d at 1015–16.

the relators' favor and disregard all evidence that was favorable to Momence but that the jury was entitled to discredit. *Id.* So long as the jury's verdict was supported by sufficient evidence under at least one valid theory of liability presented to the jury, we must affirm. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 n.4 (7th Cir. 2010).

At trial, the relators presented two overarching theories of liability under the FCA—namely, "worthless services" and false certification. We address both in turn.

### A. "Worthless Services"

The relators' arguments to the jury were primarily focused on the theory that Momence violated the FCA by providing woefully inadequate care to the facility's residents. This argument was based on the "worthless services" theory of FCA liability. The district court's jury instructions stated that "[s]ervices can be worthless, and the claims for those services can, for that reason be false, even if the nursing facility in fact provided some services to the patient. To find the services worthless, you do not need to find that the patient received no services at all." A-56. The court offered the following example to illustrate his understanding of the "worthless services" theory: "if Uncle Sam paid Momence 200 bucks and they only got $120 worth of value, [then] Momence defrauded them of $80 worth of services." A-527.

The district court's jury instruction was incorrect. The "worthless services" theory of FCA liability, which a few of our sister circuits have adopted, allows a *qui tam* relator to bring claims for violations of the FCA premised on the theory that the defendant received reimbursement for products or services

that were worthless. *See Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001); *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001); *see also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468–69 (6th Cir. 2011); *U.S. ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 824 (8th Cir. 2009). But "the performance of the service [must be] so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes*, 274 F.3d at 703; *see also Chesbrough*, 655 F.3d at 468–69; *Roop*, 559 F.3d at 824. It is not enough to offer evidence that the defendant provided services that are worth some amount less than the services paid for. That is, a "diminished value" of services theory does not satisfy this standard.[11] Services that are "worth less" are not "worthless."

Truly worthless services may be *evidence* that a claim for reimbursement is false or fraudulent (under a false certification theory of liability). *See Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 731–32 (7th Cir. 1999) (observing that a certification that "all appropriate tests" were performed may be false if the tests were known to be worthless). But we have not addressed the validity of the "worthless services" theory as a separate

---

[11]   Another circuit has observed that, "in calculating FCA damages, the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010). And, consequently, that the diminishment in value of a service may be a proper measure of *damages*. *Id*. But even this decision does not hold that "diminished services" can support *liability* under the FCA.

theory of liability under the FCA.[12] We need not do so today because the relators failed to offer evidence establishing that Momence's services were truly or effectively "worthless." Indeed, any such claim would be absurd in light of the undisputed fact that Momence was allowed to continue operating and rendering services of some value despite regular visits by government surveyors. The surveyors would certainly have noticed if Momence was providing no or effectively no care to its residents. Indeed, Absher's mother resided at Momence from 1995–2002 (i.e., during four of the years covered by this action). A-343. At trial, when Absher was asked whether she felt that her mother received "good care" at Momence, she responded, "Yes." A-373.

Even if we were to recognize the "worthless services" theory of FCA liability (a question best saved for another day), no reasonable jury could have found that Momence provided truly or effectively worthless nursing services to its residents. Accordingly, as a matter of law, the "worthless services" theory cannot support the jury's verdict on the *qui tam* claims.

---

[12] The relators point to our decision in *United States v. Rogan*, wherein a provider of medical services violated the FCA by billing the government for medical services while paying kickbacks for illegal referrals. 517 F.3d 449, 451–52 (7th Cir. 2008). In rejecting a challenge to the monetary award, we observed that the government was entitled to recoup all that it had paid to the provider, regardless of whether some medical services were provided, because the conditions triggering payment had not been met. *Id.* at 453. That ruling, though, addresses the proper measure of *damages*. We did not hold that *liability* could be established under the FCA merely based on evidence that the government received less than it had bargained for.

### B. False Certification

The district court also instructed the jury that it could find Momence liable based on the false certification theory of FCA liability. Under this theory, the relators bore the burden of proving by a preponderance of the evidence that Momence certified that it had complied with particular statutes or regulations that were conditions of, or prerequisites to, government payment, that Momence did not actually comply with those conditions, and that Momence knew that it had failed to comply with those conditions. *U.S. ex rel. Gross v. AIDS Research Alliance-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005).

The relators contend that Momence violated the FCA by knowingly making false statements on MDS forms and plans of correction as well as by *impliedly* certifying that Momence was still eligible for continued participation in Medicare and Medicaid by accepting daily payments for their patients while violating Medicare and Medicaid regulations.

### i. Implied Certification

We begin with the relators' implied certification theory. The relators contend that Momence impliedly certified that it was in compliance with Medicare and Medicaid regulations by accepting daily payments for their patients when, in fact, the facility was systemically violating a number of these regulations concerning the duties of personnel at the facility, the protocols for addressing patient care issues, and the standard of care provided.

Momence counters that the relators' implied certification theory of liability is not valid under the FCA. We need not

resolve whether *qui tam* plaintiffs may advance an implied certification theory in our circuit because the relators did not argue to the jury that the purported implied certifications were conditions of payment.[13]

On appeal, the relators argue that Momence's implied certifications were conditions of payment because government regulators could have *immediately* suspended payments to Momence if the regulators had suspected the facility of fraud (that is, that Momence was impliedly certifying compliance while knowingly not complying). *See* Appellees' Response Br. 50 (citing 42 C.F.R. §§ 405.371(a)(2), 1001.2). But the relators never presented this theory to the jury. Indeed, the relators' experts testified only that Momence violated regulations

---

[13] As noted, Momence argues that it cannot be held liable under the FCA for merely *implied* certifications. *Cf. U.S. ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 858 (7th Cir. 2006) (holding that the FCA "specifically requires a claimant to point to a specific [false] claim."). However, several of our sister circuits have permitted FCA claims to proceed under an implied certification theory. *See, e.g.*, *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 306 (3d Cir. 2011); *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 387 (1st Cir. 2011); *Sci. Applications*, 626 F.3d at 1267–70; *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 996 (9th Cir. 2010); *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008); *U.S. ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409, 415 (6th Cir. 2002); *Mikes*, 274 F.3d at 699–700. And we previously upheld an FCA verdict against a defendant who violated the Stark Amendment to the Medicare Act and the Anti-Kickback Act. *Rogan*, 517 F.3d at 451–52. The Stark Amendment forbids federal reimbursement for services that stem from illegal referrals (that is, kickbacks). *Id.* at 452. But the defendant did not explicitly certify that he was refraining from accepting illegal referrals. *Id.* (referring not to any express certification but instead to "omissions").

concerning the duties of personnel at the facility, the protocols for addressing patient care issues, and the standard of care provided. The experts did not testify that Momence violated any regulations by committing fraud. As one of the relators' experts explained, she was retained for the purpose of determining whether the care provided by Momence was appropriate and whether there was evidence that the care was so inadequate that it amounted to "worthless services." A-990–91. Therefore, because the relators did not argue to the jury that Momence committed fraud by impliedly (but falsely) certifying compliance with applicable regulations, this theory is waived on appeal. *See Staub v. Proctor Hosp.*, 560 F.3d 647, 655 (7th Cir. 2009) (holding that a party waives any theory not presented to the jury even if the theory is legally sound and supported by the evidence at trial), *rev'd on other grounds*, 131 S. Ct. 1186 (2011); *Sinclair v. Long Island R.R.*, 985 F.2d 74, 78 (2d Cir. 1993) ("[T]he verdict … cannot be sustained on a theory that was never presented to the jury."); *Boggan v. Data Sys. Network Corp.*, 969 F.2d 149, 152 (5th Cir. 1992) ("[T]he verdict can only be sustained on appeal based on the fraud theory submitted to the jury … ."); *Charles Woods Television Corp. v. Capital Cities/ABC, Inc.*, 869 F.2d 1155, 1160 (8th Cir. 1989) ("[T]heories … not before the jury … may not provide the basis for upholding the jury verdict." (internal quotation marks omitted)).

The relators also appear to argue that compliance with the various regulations was a condition of payment because Momence's failure to comply could result in its termination from the Medicare and Medicaid programs and, consequently, the facility would receive no future payments. But, again, this theory was not presented to the jury. Moreover, under the

relators' theory, even a *single* regulatory violation would be a condition of *any and all* payments subsequently received by the facility inasmuch as the regulators *could* terminate the facility for practically any deficiency. *See* 42 C.F.R. § 488.408(b). Such a result would be absurd. Because the relators offer no other argument for why Momence's implied certifications were conditions of payment, the relators' evidence in support of the implied certification theory is insufficient to support the jury's verdict.

### ii. *Express Certification*

Next, we address the relators' evidence that Momence violated the FCA by knowingly making false statements on MDS forms and plans of correction.

### a. *Plans of Correction*

The relators argue that Momence violated the FCA by certifying, in plans of correction, that it would remedy deficiencies found during government surveys, when in fact it had no intention of doing so.[14] But the relators never offered this theory to the jury. Indeed, the relators' attorneys did not mention Momence's plans of correction even once during their

---

[14] A statement about one's present intent to perform some act in the future can be false. But the mere fact that the promised act is not subsequently performed does not necessarily mean that the promisor did not intend to perform the act at the time of making the promise. *See U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005) ("[F]ailure to honor one's promise is (just) breach of contract, but making a promise that one intends not to keep is fraud."); *Price v. Highland Cmty. Bank*, 722 F. Supp. 454, 459–60 (N.D. Ill. 1989) (Posner, J., sitting by designation) ("A change of mind can be … a breach of contract, but it is not fraud.").

opening statements and closing arguments to the jury. The relators did offer evidence at trial that Momence failed to improve its documentation procedures and provide in-service training as promised in the plans of correction. *See* A-667–72, 400, 402, 408, 412, 416, 418, 422, 424, 432, 435, 442, 877, 938. But this evidence was offered to show that Momence provided inadequate care to its residents. The relators never articulated to the jury the theory that the Momence violated the FCA by promising to fulfill the terms of the plans of correction without actually intending to do so. Consequently, the relators' express certification theory based on the plans of correction is waived on appeal. *See Staub*, 560 F.3d at 655; *Sinclair*, 985 F.2d at 78; *Boggan*, 969 F.2d at 152; *Charles Woods Television Corp.*, 869 F.2d at 1160.

### b.  MDS Forms

Finally, the relators argue that Momence violated the FCA by certifying that the MDS forms accurately reflected the conditions and treatment of the patients, when in fact the forms did not properly document the symptoms, diagnosis, or treatment of scabies, pressure ulcers, and rashes. It is not clear that the relators even presented this theory to the jury. At closing arguments, the relators' attorneys only mentioned the MDS forms in the context of arguing that the care provided by Momence was worthless. On the other hand, in their opening statements, the relators' attorneys did tell the jury that Momence refused to allow nurses to chart symptoms of scabies and failed to report these symptoms to the government regulators (presumably, via the MDS forms). And, at closing arguments, the relators' attorneys argued to the jury that Momence refused to acknowledge that the facility had a

problem with scabies and directed nurses not to document symptoms of scabies.

Assuming that the relators preserved the false certification theory of FCA liability based on the certifications in the MDS forms, a reasonable jury could certainly find that these MDS forms were conditions of payment because they specifically affirm that reimbursement is "conditioned on the accuracy and truthfulness of [the] information" contained in the forms. And such a certification of accuracy is required by the Medicare and Medicaid regulations. *See* 42 C.F.R. § 483.20. Nevertheless, the relators' case premised on the MDS forms still fails because of a fatal lack of evidence. The relators did not offer any evidence regarding how many, even roughly, of the MDS forms contained false certifications.

The jury found that Momence made 1,729 false certifications. As stated above, the question for us is whether the evidence presented to the jury, construed in the relators' favor, is sufficient to support a finding that Momence filed 1,729 false certifications. The jury's determination must be based in evidence—it cannot be based on mere speculation. *See, e.g.,* *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("Even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork.").

At trial, the relators offered evidence that Momence created approximately 2,070 MDS forms per Medicare and Medicaid patient per year during the relevant time period. But how many of these contained false certifications? In their brief, the relators point to the following evidence:

First, an outbreak of scabies occurred at Momence's facility between March and November 2002. A-1196. But Ilene Warner-Maron, a health services professor, testified that Momence's records reflected no correlation between how many residents had symptoms of scabies, diagnoses of scabies, and treatment for scabies. A-1000. This indicates that not all residents with scabies were properly diagnosed or treated. But the relators offer no evidence regarding (even roughly) how many residents likely had scabies symptoms without diagnoses or treatment.

Second, Momence documented no pressure ulcers during certain months interspersed between months wherein Momence documented numerous pressure ulcers. A-996, 1003, 1197. Because it is unlikely that the number of pressure ulcers at the facility so frequently dropped from a high number to zero one month and then jumped back up to a high number the very next month, a jury could reasonably conclude that Momence failed to document some pressure ulcers that occurred during the months with no reported pressure ulcers. But again, the relators offer no evidence regarding even approximately how many such pressure ulcers were not documented.

Finally, relators point out that one government survey report concluded that Momence failed to track the development of rashes among certain residents. A-730. And the relators offered testimony that Momence instructed nurses to exclude the word "scabies" from residents' charts. But, again, the relators offer no evidence allowing the jury to find (even approximately) how many times Momence did not document rashes or scabies.

The problem is not simply that the relators failed to come forth with evidence that *particular* MDS forms contained false certification or evidence of *precisely* how many of the MDS forms contained false certifications. Rather, the relators have failed to offer evidence establishing that even a *roughly approximate* number of forms contained false certifications. Tellingly, when pressed at oral argument, counsel for the relators was only able to identify evidence in the record regarding how many MDS forms were created by Momence. But counsel was unable to tell us, even approximately, how many MDS forms contained false certifications.[15]

The relators point to *Rogan*'s *dicta* that a judge, in ruling in a bench trial, need not specifically address (in its factual findings) each form (of 1,812 forms) in concluding that those forms were false. *See* 517 F.3d at 453. Rather, *Rogan* states, "[s]tatistical analysis should suffice." *Id.* But there has to be some evidence—statistical or otherwise—from which the jury could determine (at least approximately) how many of Momence's documents contained false certifications. (Of course, because *Rogan* involved violations of the Stark Amendment to the Medicare Act and the Anti-Kickback Act, *each and every* form filed by the defendant was false. Thus, in *Rogan* unlike here, evidence of how many forms *were filed* was sufficient to establish how many of those forms *were false*.)

---

[15] The relators' implied certification theory would suffer from the same fatal defect even assuming the evidence at trial established that Momence's *implied* (but false) certifications were conditions of Medicare and Medicaid reimbursement.

At best, a reasonable jury might be able to say that *some* of Momence's claims were false. But that is not enough to satisfy the relators' burden of proof. Of course, the relators' difficulty in coming forward with evidence supporting even an approximate finding regarding how many of Momence's claims were false may be partly attributed to Momence's wrongdoing. But, under the FCA, the plaintiff must "prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." 31 U.S.C. § 3731.[16] A defendant's wrongdoing does not shift the burden of proof to the defendant under the FCA. *Crews*, 460 F.3d at 857; *see also Bigelow*, 327 U.S. at 264.

In conclusion, the relators' false certification theory fails as a matter of law either based on the lack of evidence at trial or on waived theories of materiality (that is, whether the certification is a condition of payment). Because, as explained above, the relators' "worthless services" theory also fails as a matter of law, the relators' cross-appeal regarding the district court's set-aside of the $19 million in fines necessarily fails.

### IV. Other Claims

Lastly, Momence argues that the relators' retaliation claims and claims against Jacob Graff, in his individual capacity, fail as a matter of law. We apply the standards enunciated in the prior section.

---

[16] Again, the precise subsection was renumbered after the relators brought this action, but the changes are not material to this appeal. *Compare* 31 U.S.C. § 3731(c) (2003) *with* 31 U.S.C. § 3731(d) (Supp. 2014).

### A. Retaliation Claims

We now turn to the retaliation claims. To prove retaliation, the relators must offer evidence from which the jury could find that the relators' actions were taken in furtherance of an FCA or IWRPA enforcement action (and were therefore protected by the statutes); that Momence had knowledge that they were engaged in this protected conduct; and that their discharge was motivated, at least in part, by the protected conduct. *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004); *see also* 31 U.S.C. § 3730(h); 740 Ill. Comp. Stat. 175/4(g) (1996, *amended* 2012).

Momence terminated Mitchell's employment in February 2003. A-93,127. At trial, the relators offered evidence that Mitchell reported concerns to her supervisors about the neglect of patients, the lack of bedding and adequate staffing, and apparent scabies. A-107–09. In 2002, Mitchell twice reported scabies to IDPH, and one of her superiors threatened to terminate her employment if she did so again. A-164–66, 236–37. In February 2003, Mitchell called IDPH to report the circumstances surrounding the death of a resident. A-170–87. Mitchell testified that her superior, Sue Cavender, upon learning of the call, called her a "stupid bitch" and told her not to call IDPH again. Cavender also ordered Mitchell to alter the patient's chart to reflect that the doctor had been called, but Mitchell refused to do so. A-201–02. The next day, Momence terminated Mitchell's employment.[17]

---

[17] Momence offered evidence that Mitchell was terminated for her role in

(continued...)

Unfortunately for Mitchell, she has failed to offer evidence from a which a reasonable jury could find that she engaged in protected conduct under the FCA or the IWRPA. The FCA protects conduct performed "'in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed.'" *Fanslow*, 384 F.3d at 479 (quoting 31 U.S.C. § 3730(h)). Although an employee need not have actual knowledge of the FCA, the employee must undertake the protected conduct with the actual and reasonable belief "that the employer is committing fraud against the government." *Id.* at 480 (internal quotation marks omitted). Mitchell's complaints demonstrate her concern about the standard of care provided at Momence, but there is nothing to suggest that she was trying to investigate or report suspected fraud on Momence's part. And although Mitchell's superior's command that she alter a chart smacks of fraud, that command occurred after Mitchell's last call to IDPH. Therefore, Mitchell's retaliation claims fail as a matter of law.[18]

---

[17] (...continued)

the resident's death after an internal investigation found that she mismanaged his care and falsified documents in his medical chart. A-207. But, again, we cannot rely upon evidence favorable to Momence but that the jury was entitled to reject.

[18] Perhaps the evidence would support a retaliation claim under a more general whistle-blower statute. After all, Mitchell did call a state agency to report problems of substandard care. *See*, *e.g.*, 5 U.S.C. § 2302(b) ("Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority …

(continued...)

Unlike Mitchell, Absher's employment was not terminated. Rather, she resigned her position with Momence, but contends that she did so because she was constructively discharged by Momence inasmuch as she could not bear to continue working at the facility in light of the poor care being provided. At trial, the relators offered evidence that Absher complained to her supervisors about a number of substandard conditions at Momence, including infected catheters, inadequate patient nutrition, and undocumented scabies. A-314–18. Instead of addressing the problems, her superiors frequently responded to her complaints with hostility. A-324–25. In 2002, Absher made 10–20 calls to IDPH to report scabies, under-staffing, and incidents wherein the facility lacked hot water. A-377, 394–95. When Cavender learned of the call, she asked Absher if she was crazy. A-395–96. Her supervisors did promise to address her concerns, A-354–55, but then one of her supervisors suggested that she apply for mental health leave in January 2003. A-355. Although Absher did request such leave, she continued to work until February 2003 when a resident died

---

[18] (...continued)

(8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of– (A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences--(i) any violation of any law, rule, or regulation … ."); 740 ILCS 174/15(b) ("An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation."). But the relators only brought their allegations under the FCA and the IWRPA, and they never moved to amend the pleadings to conform them to the evidence. *See* Fed. R. Civ. P. 15(b)(2).

(the same death involved in Mitchell's termination). Absher testified that this death was the last straw for her, and she resigned on February 8, 2003. A-356, 372.

The initial problem with Absher's retaliation claims is that Momence did not terminate her employment. Absher invokes the doctrine of constructive discharge, but she offered no evidence at trial that Momence did anything to make her employment unbearable. *See Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) ("Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment … ."). Supervisors' hostility towards an employee's complaints is not enough. And, although it must be frustrating for a nurse to work in a healthcare facility that she believes provides substandard care, Absher does not contend that Momence provided substandard care in order to push Absher to resign. Moreover, even if Absher could establish that she was constructively discharged, she (like Mitchell) offers no evidence from which a reasonable jury could infer that she was trying to investigate or report suspected fraud on Momence's part. *See Fanslow*, 384 F.3d at 479–80. Therefore, Absher's retaliation claims also fail as a matter of law.

## B.  Claims Against Jacob Graff

Because the relators' claims fail on the merits as a matter of law, we need not address Graff's additional arguments for reversal of the judgment against him in his individual capacity.

## V. Conclusion

Although the relators' *qui tam* claims are not barred by § 3730(e)(3) or § 3730(e)(4), they fail as a matter of law. Consequently, the relators' cross-appeal regarding the district court's set-aside of the $19 million in fines necessarily fails. Additionally, the relators' retaliation claims fail as a matter of law. Therefore, we VACATE the judgment entered for the plaintiffs—in both their individual and relator capacities—in this case on February 16, 2013, and REMAND to the district court with the directions that judgment be entered for the defendants.