In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1143

CAUSE OF ACTION,

*Plaintiff-Appellant*,

*v.*

CHICAGO TRANSIT AUTHORITY, an
Illinois municipal corporation,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-09673 — **Robert M. Dow, Jr.**, *Judge*.

ARGUED SEPTEMBER 10, 2015 — DECIDED FEBRUARY 29, 2016

Before FLAUM, RIPPLE, and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Cause of Action, a nonprofit government watchdog organization, brought this action against the Chicago Transit Authority ("CTA") under the *qui tam* provision of the False Claims Act ("FCA" or "Act"), 31 U.S.C. § 3730. Cause of Action alleged that, for several decades, the CTA had been misreporting fraudulently transit data to the

Federal Transit Administration ("FTA") in order to secure in-
flated federal grant allocations. The district court dismissed
the action, holding that it lacked subject matter jurisdiction
over Cause of Action's FCA claims because its allegations of
wrongdoing had been publicly disclosed at the time the action
was filed. We agree that the allegations had been publicly dis-
closed and therefore affirm the judgment of the district court.

# I

# BACKGROUND

## A.

Under the Urbanized Area Formula Program ("UAFP"),
49 U.S.C. § 5307, the FTA administers grant funding to large
urban transit programs for "operating costs of equipment and
facilities for use in public transportation." *Id.* § 5307(a)(1)(D).
The statute requires grant recipients to submit "financial, op-
erating, and asset condition information" about their transit
systems to the National Transit Database ("NTD"). *Id.*
§ 5335(a)–(c). The agency then apportions grants based, in
part, on the number of Vehicle Revenue Miles ("VRM") re-
ported to the NTD by the transit program. *Id.*
§ 5336(c)(1)(A)(i). According to the NTD, VRM accrue while a
vehicle is "in revenue service," those miles for which a "vehi-
cle is available to the general public and there is an expecta-
tion of carrying passengers." Nat'l Transit Database, 2006 Ur-
banized Area Reporting Manual, Glossary 384, 396 (2006),
*available at* http://www.ntdprogram.gov/ntdprogram/pubs/
ARM/2006/pdf/2006_Reporting_Manual_Glossary.pdf. So-
called "deadhead miles"—miles accumulated while a vehicle

is out of revenue service—specifically are excluded from the VRM calculation. *Id.* at 352, 396.

The CTA is a municipal corporation providing public transportation services in the greater Chicago area; it receives federal grant funding through the UAFP. In 2005, the Illinois House of Representatives adopted Resolution Numbers 479 and 650, which, among other matters, directed the Illinois Auditor General ("IL-AG") to conduct a performance audit of the CTA. During the course of this audit, Thomas Rubin, a subcontractor on the IL-AG audit team, helped prepare a twenty-five page report titled "Chicago Transit Authority Overreporting of Motor Bus Vehicle Revenue Miles," which examined in detail the CTA's VRM reporting practices ("Technical Report").[1] Mr. Rubin's Technical Report concluded that the CTA, from possibly as early as 1986, had been overstating its VRM when making its annual certifications to the NTD and, consequently, had received higher than justified UAFP grant disbursements. The Technical Report recommended that the CTA inform the FTA of the situation and become compliant by revising its reporting methodology.

In March 2007, the IL-AG released its final performance audit report ("Audit Report"). On page seventy-two of the Audit Report, the IL-AG explained that its review, which included the Technical Report, had "raised questions about the accuracy of [the] CTA's reporting of revenue vehicle hours and miles" and concluded, based on the "clear[]…differences in reported hourly values for [the] CTA and the peer group,"

---

[1] R.3-3.

that the "CTA may [have been] incorrectly reporting some deadhead hours/miles as revenue hours/miles."[2]

In 2009, Mr. Rubin notified the Department of Transportation Office of Inspector General ("DOT-OIG") of the CTA's misreporting and provided it with a copy of his Technical Report. Mr. Rubin also provided copies of the Technical Report, the Audit Report, and a sworn affidavit to Cause of Action. On March 28, 2012, Cause of Action sent a letter to the Department of Justice requesting an investigation into the CTA's reporting practices.

Approximately one month later, on April 27, 2012, the FTA sent a letter to the CTA explaining that the FTA had conducted an "in-depth review" of the CTA's reporting of VRM data ("FTA Letter").[3] The FTA Letter indicated that the CTA

---

[2] R.3-4 at 126.

[3] The FTA Letter to the CTA states in full:

> The Federal Transit Administration (FTA) has conducted an in-depth review regarding the way in which Vehicle Revenue Miles (VRM) and Vehicle Revenue Hours (VRH) are reported to the National Transit Database (NTD) by the Chicago Transit Authority (CTA). As a result of our review, CTA should revise its data for the 2011 Report Year to reflect the definition of "revenue service" in the NTD Reporting Manual and should continue to follow the definition of "revenue service" from the NTD Reporting Manual for future report years. The FTA will not, however, require CTA to revise its annual NTD Reports from prior years.

> The initial inquiry was made regarding CTA's relatively low percentage of "deadhead" mileage compared to other large transit agencies. In your October 2011 memorandum you

stated that efficient scheduling practices, the convenient location of CTA bus garages, and frequent midday bus service explained the high VRM reported to the NTD. You also noted that CTA cannot speak for the scheduling or reporting practices of other transit agencies.

To further study this situation, we asked you to send FTA detailed data on the patterns and blocks used by CTA to schedule its buses. FTA selected 10 bus trip blocks from this data for analysis. Upon selecting the data set, FTA mapped each trip from the pull-out from the bus garage, through the revenue service trip, and then to the return pull-in to the bus garage. In 7 of the 10 bus blocks analyzed, FTA found that the bus left the garage, traveled a short distance on one bus route (recorded as "revenue service"), and then moved to the primary bus route, which the bus served for the bulk of the block.

FTA appreciates CTA's efforts to operate transit service as efficiently as possible and to minimize "deadhead" time in favor of revenue service. However, FTA's funding formulas rely upon applying a consistent definition of "revenue service" across all transit systems in the country in order to ensure a fair and equitable distribution of formula funds.

As such, FTA established the following three-part definition of revenue service in its 2011 NTD Urbanized Area Reporting Manual (page 212): (1) that the service must be advertised as being available to the general public; (2) there must be a marked stop that is advertised in the schedule; and; (3) there must be an indication on the bus (e.g., head sign, window board) that the bus is in revenue service.

Using the data you provided (see enclosure), FTA examined CTA's published schedules and found that each bus that arrived at the primary route was reflected on the schedules. FTA did not, however, find the bus routing between the garage and the primary route to be included on the published

had cooperated in the review by providing detailed data on the patterns and blocks it used to schedule its buses. It then directed the CTA to revise its VRM data for reporting year 2011 and for future years but did not require the CTA to revise any VRM data for prior years.

**B.**

Cause of Action brought this *qui tam* action under the FCA in the United States District Court for the District of Maryland in May 2012. In its complaint, Cause of Action alleged two counts of fraudulent conduct by the CTA based on its inaccurate VRM reporting and sought damages, a declaratory judgment, and injunctive relief. Cause of Action attached to its complaint the Technical Report, the Audit Report, and Mr. Rubin's affidavit. The federal court in Maryland transferred the case to the Northern District of Illinois. The United States then declined to intervene, and the complaint was unsealed.

The CTA then moved for dismissal on the ground that Cause of Action had failed to establish subject matter jurisdiction under the FCA's public-disclosure bar, 31 U.S.C. § 3730(e)(4). That section withdraws jurisdiction over *qui tam* actions based on allegations that already have been disclosed

---

schedules. Therefore, although buses traveling on this secondary route between the garage and the primary route may stop at marked bus stops and may indicate "revenue service" on their head signs, this travel does not meet the NTD definition of "revenue service."

R.55-1 at 2–3.

publicly through certain enumerated sources unless the rela-
tor is an original source of the information. In opposing the
motion to dismiss, Cause of Action contended that the public-
disclosure bar had not been triggered and that, in any case,
§ 3730(e)(4) no longer constitutes a jurisdictional hurdle be-
cause a 2010 amendment had replaced the phrase "no court
shall have jurisdiction" with the phrase "[t]he court shall dis-
miss."[4] In reply, the CTA conceded that, in light of the 2010
amendments, the correct approach would be for the court to
treat its motion as a Rule 12(b)(6) motion to dismiss for failure
to state a claim.

The district court did not decide whether the 2010 version
of § 3730(e)(4) was jurisdictional or substantive. It held that,
under either standard, dismissal was appropriate. Turning to
the applicability of the public-disclosure bar, the court first
noted that the sole issue in dispute was whether the allega-
tions in the complaint had been publicly disclosed; Cause of
Action had waived any argument under the statute that its
allegations were not substantially similar to the disclosures or
that it qualified as an original source. The court then con-
cluded that Cause of Action's allegations had been publicly
disclosed in the FTA Letter as well as in the Technical and
Audit Reports, and that, consequently, its *qui tam* suit was
precluded by the public-disclosure bar.[5]

---

[4] R.55 at 14–15.

[5] As we note later, in this case, we must apply the earlier version of
§ 3730(e)(4)(A). *See infra* note 14. We therefore need not determine whether
the new language of the 2010 amendment is jurisdictional. We note that
the circuits that have had to determine whether the new statutory lan-
guage is jurisdictional have held that the language of the 2010 amendment

## II

## DISCUSSION

The applicable standard of review is not in dispute. Although the district court did not specify whether it dismissed Cause of Action's complaint under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), in either case, "[w]e review *de novo* challenges made pursuant to the FCA's bars." *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 707 (7th Cir. 2014).

### A.

First enacted in 1863 to combat rampant fraud and price-gouging in Civil War defense contracts, the FCA enables the United States Government to recover losses sustained as the result of fraud committed against it. The Act imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the Government. 31 U.S.C. § 3729(a)(1). The statute makes civil penalties and treble damages available as remedies. *See id*. The FCA further contemplates that "[t]he Attorney General diligently shall investigate a violation under section 3729," and, if substantiated, "may bring a civil action…against the person" directly in the name of the United States. *Id*. § 3730(a). From its inception, however, the FCA also

---

is not jurisdictional. *See United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, No. 14-4292, 2016 WL 386087, at *5 (3d Cir. Feb. 2, 2016) ("[W]e conclude that the amended bar is not jurisdictional."); *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) (same); *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 916 (4th Cir. 2013) (same).

has contained a so-called *qui tam* provision, which permits a private party, known as a "relator," to bring a civil action alleging fraud against the Government on its own behalf as well as on behalf of the United States. *See id.* § 3730(b)(1). If the claim is proven, the relator receives a percentage of the recovery. *See id.* § 3730(d).

In its initial form, the FCA "did not limit the sources from which a relator could acquire the information to bring a *qui tam* action." *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 293–94 (2010). Consequently, relators were not obligated to supply any new information before filing a complaint under the FCA. Yet, "[d]espite this invitation for abuse, the *qui tam* provisions were used sparingly during their first half-century." *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994). With the proliferation of New Deal and World War II government contracts, however, came both an increase in fraud and a corresponding surge in *qui tam* litigation. *Id.* And due to the liberality of the provisions then in effect, individuals who had played no part in uncovering a fraud were free to bring "parasitic" lawsuits based on information that was entirely the product of the Government's own investigation. *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 545–46 (1943) (upholding relator's recovery in *qui tam* suit based solely on information contained in a criminal indictment to which it had not contributed). Such purely duplicative litigation "not only diminished the government's ultimate recovery without contributing any new information," but also "put pressure on the government to make hasty decisions regarding whether to prosecute civil actions." *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 680 (D.C. Cir. 1997).

Responding to this opportunism, Congress amended the *qui tam* provisions in 1943 "to preclude *qui tam* actions 'based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.'" *Graham Cty.*, 559 U.S. at 294 (quoting Act of Dec. 23, 1943, Pub. L. No. 213, 57 Stat. 608, 609 (codified at 31 U.S.C. § 232(C)(1946))). This broadly worded "government-knowledge" bar, however, overcorrected for its predecessor, stymying the *qui tam* provision's enforcement by depriving courts of jurisdiction over otherwise meritorious suits. *See, e.g.*, *United States ex rel. Wisconsin v. Dean*, 729 F.2d 1100, 1106–07 (7th Cir. 1984) (precluding State of Wisconsin from bringing *qui tam* action because the state already had reported the alleged fraud to the federal government, as required by statute). "[O]nce the United States learned of a false claim, only the Government could assert its rights under the FCA against the false claimant." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997) (internal quotation marks omitted). As a result, "the volume and efficacy of *qui tam* litigation dwindled." *Graham Cty.*, 559 U.S. at 294.

In 1986, Congress again overhauled the Act in order "to encourage any individual knowing of Government fraud to bring that information forward." S. Rep. No. 99-345, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266–67. On the whole, the 1986 reforms were meant to broaden the *qui tam* provisions in order to encourage private individuals to disclose fraudulent conduct. *See id.* at 6–8. As the legislative history indicates, however, this time Congress also "sought to resolve a tension between…encouraging people to come forward with information and…preventing 'parasitic' lawsuits." *False Claims Act Implementation: Hearing Before the Subcomm. on Admin. Law and Gov't Relations of the H. Comm. on the Judiciary*,

101st Cong. 5 (1990) (statement of co-sponsor Sen. Grassley); *accord Springfield Terminal*, 14 F.3d at 649 (noting that Congress sought "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own"). Accordingly, the 1986 amendments repealed the government-knowledge bar and replaced it with the more circumscribed public-disclosure bar to *qui tam* jurisdiction:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (1994) (footnote omitted). The 1986 statute defined an "original source" as someone possessing "direct and independent knowledge" of the alleged wrongdoing who "voluntarily provided the information to the Government before filing an action." *Id*. § 3730(e)(4)(B).[6]

---

[6] Congress revised the public-disclosure bar again in 2010 as a part of the Patient Protection and Affordable Care Act. Pub. L. No. 111–148, § 10104(j)(2), 124 Stat. 119, 901–02 (2010). Our cases hold that the 2010 changes to § 3730(e)(4)(A) are not retroactive and therefore the applicable version of subsection (A) is the one that was "in force when the events underlying th[e] suit took place." *United States ex rel. Goldberg v. Rush Univ.*

**B.**

To determine if an action is barred under § 3730(e)(4), we engage in a three-step analysis. *See, e.g.*, *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). We first examine whether the allegations in the complaint have been "publicly disclosed" through one of the enumerated channels. *Id.* If so, we then determine whether the relator's lawsuit is "based upon," *i.e.*, "substantially similar to," those publicly disclosed allegations. *Id.* at 913, 920. If it is, the public-disclosure bar precludes the action unless "the relator is an 'original source' of the information upon which [the] lawsuit is based." *Id.* at 913. The relator bears the burden of proof at each step of the analysis. *Id.*

**1.**

Under the first step of the § 3730(e)(4) framework, the allegations in a complaint are publicly disclosed "when the critical elements exposing the transaction as fraudulent are placed in the public domain." *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003). This definition presents two distinct issues: whether the relevant information was "placed in the public domain," and, if so,

---

*Med. Ctr.*, 680 F.3d 933, 934 (7th Cir. 2012) (citing *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010)). However, Congress's modification of the "original source" definition in subsection (B) "is a clarifying rather than a substantive amendment" and thus is "not subject to a retroactivity bar." *United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 369 (7th Cir. 2016). We discuss the specific applications of these amendments as they arise in our analysis.

whether it contained the "critical elements exposing the transaction as fraudulent." *Id.*

### a.

We turn first to the language "in the public domain." In construing this phrase, we have recognized the uncontroversial proposition that material is in the public domain when the information is open or manifest to the public at large. *Id.* (defining "public" as "accessible to or shared by all members of the community" (quoting Webster's Ninth New Collegiate Dictionary 952 (1987))); *see United States v. Bank of Farmington*, 166 F.3d 853, 860 (7th Cir. 1999) ("A plain and ordinary meaning of 'public' is 'open to general observation, sight, or cognition,…manifest, not concealed'; that of 'disclosure' is 'opening up to view, revelation, discovery, exposure.'" (citation omitted) (quoting 12 Oxford English Dictionary 780 (2d ed. 1989); 4 *id.* at 738)). For instance, the critical elements of a fraud "[c]learly" entered the public domain through a series of government audits that were covered by the news media, *United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 728–29 (7th Cir. 2006), but not through unfiled discovery materials that were merely "potentially accessible to the public," *Bank of Farmington*, 166 F.3d at 860.

Beyond revelation to the general public, however, we further have recognized that the phrase "in the public domain" has an alternative meaning: where the "facts disclosing the fraud itself are in the government's possession." *Absher*, 764 F.3d at 708. In *United States v. Bank of Farmington*, 166 F.3d 853 (7th Cir. 1999), we explained that "[t]he point of public disclosure of a false claim against the government is to bring it to

the attention of the authorities, not merely to educate and enlighten the public at large about the dangers of misappropriation of their tax money." *Id.* at 861. This purpose, we noted, was in accord with "a standard meaning of 'public,' which can also be defined as 'authorized by, acting for, or representing the community.'" *Id.* (quoting 12 Oxford English Dictionary 779 (2d ed. 1989)). We therefore held that the "[d]isclosure of information to a competent public official…[is a] public disclosure within the meaning of § 3730(e)(4)(A) when the disclosure is made to one who has managerial responsibility for the very claims being made" because "disclosure to the public official responsible for the claim effectuates the purpose of disclosure to the public at large." *Id.*

Since *Bank of Farmington*, we have embraced the proposition that because "the purpose of a public disclosure is to alert the responsible authority that fraud may be afoot," the Government's possession of the information exposing a fraud is alone sufficient to trigger the public-disclosure bar. *Glaser*, 570 F.3d at 914 (quoting *Feingold*, 324 F.3d at 496). Building on this rationale, we held in *Feingold* that administrative reports containing the critical elements of fraud, when generated by the responsible authority itself, "are publicly disclosed because, by their very nature, they establish the relevant agency's awareness of the information in those reports." 324 F.3d at 496. Six years after *Feingold*, we invoked *Bank of Farmington* again, this time in the context of an administrative investigation. *Glaser*, 570 F.3d at 913–14. In *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009), the *qui tam* relator alleged that the defendant, a wound-care services provider, had been allowing its nurse practitioner to bill Medicare at a higher rate by representing that the practitioner's services were "incident to" the services of a physician when, in reality,

they were provided without supervision. *Id.* at 911. Prior to the filing of the complaint, however, the Centers for Medicare & Medicaid Services ("CMS") had discovered the defendant's billing irregularities during a routine audit and begun "periodically sen[ding] letters asking [the defendant] to repay funds it received at the higher doctor's rate." *Id.* Based on the CMS's letters to the defendant, we determined that the responsible authorities possessed more than "mere…awareness of wrongdoing," which alone would have been insufficient to establish a public disclosure. *Id.* at 913–14 (citing *Bank of Farmington*, 166 F.3d at 860 n.5). Rather, the communications indicated that CMS "had knowledge of possible improprieties…and was actively investigating those allegations and recovering funds." *Id.* at 914. We held therefore that "the critical elements exposing the transaction as fraudulent [had been] placed in the public domain, and therefore the allegations at the heart of [the relator's] lawsuit were publicly disclosed by the time her complaint was filed." *Id*. (first alteration in original) (citation omitted) (internal quotation marks omitted).

With this precedent in mind, we examine first whether the FTA Letter was publicly disclosed within the meaning of the statute.[7] The district court, relying on our decision in *Glaser*, held that the review described in the FTA Letter "amount[s] to precisely the type of active investigation that the Seventh Circuit identified in *Glaser*. Accordingly the CTA's inaccurate

---

[7] The federal administrative investigation described in the FTA Letter qualifies as an eligible source of disclosure under both the 1986 and 2010 versions of the public-disclosure bar. *See Graham Cty.*, 559 U.S. at 283 (interpreting the 1986 version); § 3730(e)(4)(A) (2012) (limiting the public-disclosure bar to federal sources).

reporting was publicly disclosed in the FTA's investigation by the time the complaint was filed in May 2012."[8] Cause of Action attempts to distinguish *Glaser* by asserting that "[i]n this case, by contrast, the government has done nothing to recover the money that [the] CTA should not have received. This fact, and this fact alone, should be enough to prevent the public disclosure bar."[9]

The distinction that Cause of Action identifies is not relevant to our analysis. In *Glaser*, we were clear that "mere governmental awareness of wrongdoing does not mean a public disclosure occurred." 570 F.3d at 913. There, the CMS's letters were significant because they indicated that the responsible authority had proceeded beyond mere "knowledge of possible improprieties" to the point of "actively investigating those allegations," which placed them in the public domain. *Id.* at 914. Here, like in *Glaser*, the FTA, as the responsible authority, was not "simply aware" of the misreporting. *Id*. The FTA Letter specifically references the agency's "in-depth review" of the CTA's reporting practices, facilitated at least in part by the CTA's cooperation, and describes in some detail the results of the inquiry.[10] There is no support in either the FCA or our case law for attaching jurisdictional significance to the outcome of an administrative investigation beyond its undertaking. Thus, under our precedents, the FTA Letter was "placed in the public domain" when it was sent to the CTA. *Feingold*, 324 F.3d at 495.

---

[8] R.61 at 10 (citation omitted).

[9] Appellant's Br. 16 n.20.

[10] R.55-1 at 2–3.

Some of our sister circuits have criticized our reading of this term. In their view, "a 'public disclosure' requires that there be some act of disclosure to the public *outside of the government.*" *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 728 (1st Cir. 2007) (emphasis added).[11] These courts rely primarily on the text of § 3730(e)(4)(A). A disclosure, they explain, requires both "an affirmative act" and a "recipient…to whom the information is revealed." *United States ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.*, 777 F.3d 691, 696 (4th Cir. 2015). That recipient, they maintain, is the public.

---

[11] *See also United States v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 782 F.3d 260, 268 (6th Cir. 2015) (rejecting *Bank of Farmington* and holding that "§ 3730(e)(4) requires some affirmative act of disclosure to the public outside the government"); *United States ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.*, 777 F.3d 691, 697 (4th Cir. 2015) ("Today we too reject the Seventh Circuit's view, holding instead that a public disclosure requires that there be some act of disclosure *outside of the government.*" (emphasis in original) (internal quotation marks omitted)); *United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 42 (D.C. Cir. 2014) ("The plain text of the public disclosure bar delineates three channels through which information can be made public for purposes of invoking the bar.…The government's own, internal awareness of the information is not one such channel."); *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1201 (9th Cir. 2009) ("[E]ven when the government has the information, it is not publicly disclosed under the Act until it is actually disclosed to the public."); *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180, 1186 (10th Cir. 2008) ("Interpreting the FCA to establish release of information into the public domain as the trigger to remove subject matter jurisdiction fits with the purposes of the Act and the 1986 amendments."); *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496 n.7 (11th Cir. 1991) ("Even if a government investigation was pending at the time [the relator] filed his *qui tam* complaint, such fact would not jurisdictionally bar [the FCA claim].").

And because "the Government is not the equivalent of the public," the phrase must be read to mean that "only disclosures made to the public at large or to the public domain ha[ve] jurisdictional significance." *Id.* at 696–97 (internal quotation marks omitted). Otherwise, "[i]f providing information to the government were enough to trigger the bar, the phrase 'public disclosure' would be superfluous." *Rost*, 507 F.3d at 729.[12]

Our sister circuits also emphasize the congressional intent behind replacing the broad Government-knowledge bar with the more precise public-disclosure bar. "As a result of that change, the inquiry shifted from whether the relevant information was known to the government to whether that information was publicly disclosed in one of the channels specified by the statute." *United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 42 (D.C. Cir. 2014). Thus, to credit the Government's internal knowledge alone as sufficient to withdraw jurisdiction, as our case law permits, is to "essentially reinstate a jurisdictional bar Congress expressly eliminated." *Id.*; *accord Rost*, 507 F.3d at 729–30. Moreover, according to these courts, requiring outward disclosure helps to strike the balance sought by Congress between encouraging private citizens with first-hand knowledge to step forward while discouraging opportunistic plaintiffs from capitalizing on public information generated by others. *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180, 1186 (10th Cir.

---

[12] Several of these cases also emphasize the use of the word "Government" elsewhere in the FCA. *See Chattanooga-Hamilton*, 782 F.3d at 268; *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 729 (1st Cir. 2007) ("The statute itself uses the term 'Government' numerous times and does not once equate the government with the public.").

2008); *Springfield Terminal*, 14 F.3d at 653 ("If [information is] not yet in the public eye, no rational purpose is served—and no 'parasitism' deterred—by preventing a *qui tam* plaintiff from bringing suit based on [its] contents."). Finally, several courts have noted that our "interpretation is also contrary to another legislative purpose reflected in the 1986 amendments: it was the Congressional intent, through the requirement of public disclosure, to help keep the government honest in its investigations and settlements with industry. Once allegations are made public, the government can be forced to act by public pressure." *Rost*, 507 F.3d at 730; *accord Maxwell*, 540 F.3d at 1186.

There is significant force in the position of the other circuits. If the FTA letter were the only document before us in this case, respect for the position of the other circuits would warrant in-depth reconsideration of our precedent. However, we need not address squarely the correctness of *Bank of Farmington* today because, as Cause of Action concedes, the Audit Report was "in the public domain" at the time the complaint was filed.[13]

---

[13] Appellant's Br. 20 ("The Audit Report was in the public domain."). We note that during oral argument, counsel for the CTA informed us that the Audit Report was made available online. A brief internet search revealed that the Audit Report was posted on the Illinois Auditor General website, which contains a database of reports dating back to 1974. Performance Audit: Mass Transit Agencies of Northeastern Illinois, Illinois Auditor General (March 2007), http://www.auditor.illinois.gov/audit-reports/Performance-Special-Multi/Performance-Audits/07-Mass-Transit-NE-IL-Perf-Main-Report.pdf. Moreover, according to the website, "[c]opies of all audits are made available to members of the Legislature, the Governor, agency management, the media, and the public," and "[a]udit reports are

**b.**

Because the Audit Report[14] was in the public domain at
the time Cause of Action filed its complaint, we examine

---

reviewed by the Legislative Audit Commission in a public hearing" dur-
ing which "[t]estimony is taken from the agency regarding the audit find-
ings and the plans the agency has for corrective action." *Description*, Illi-
nois Auditor General, http://www.auditor.illinois.gov/About/descrip-
tion.asp (last visited Feb. 18, 2016). Although unnecessary in light of Cause
of Action's admission, "[w]e may take judicial notice of matters of public
record." *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d
600, 607 (7th Cir. 2002) (taking judicial notice of the ownership of a bank
from FDIC website); *accord LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628
F.3d 937, 944 n.3 (7th Cir. 2010) (taking judicial notice of information on
Village of Winnetka's website); *Denius v. Dunlap*, 330 F.3d 919, 926 (7th
Cir. 2003) (taking judicial notice of military personnel records from Na-
tional Personnel Records Center website).

[14] At first glance, relying on the Audit Report (a state document) as the
source of disclosure for data submitted after the effective date of the 2010
amendments (here, reporting years 2009 and 2010) might seem problem-
atic because the 2010 iteration limits public disclosure to federal sources.
*See* 31 U.S.C. § 3730(e)(4)(A) (2012). Although we apply the version of sub-
section (A) that was "in force when th[e] events underlying the suit took
place," *Goldberg*, 680 F.3d at 934; *accord Bogina*, 809 F.3d at 369; *see also
Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 948 (1997)
(noting that the amendment in question "eliminate[d] a defense to a *qui
tam* suit—prior disclosure to the Government—and therefore change[d]
the substance of the existing cause of action for *qui tam* defendants by at-
taching a new disability, in respect to transactions or considerations al-
ready past" (alteration omitted) (internal quotation marks omitted)), we
do not think that, here, it is necessary or appropriate to characterize the
2009 and 2010 reporting years as discrete events. Rather, they are part of
the CTA's continuing practice of counting non-revenue miles. As we ex-
plain, the Audit Report provided notice of the CTA's continuing practice
prior to the enactment of the 2010 amendments. *Cf. Bogina*, 809 F.3d at 370

whether that document contained "the critical elements exposing the transaction as fraudulent." *Feingold*, 324 F.3d at 495; *see United States ex rel. Found. Aiding the Elderly v. Horizon W. Inc.*, 265 F.3d 1011, 1014 (9th Cir. 2001) ("[W]e…determine whether the content of the disclosure consisted of the allegations or transactions giving rise to the relators' claim, as opposed to mere information." (internal quotation marks omitted)). Section 3730(e)(4) withdraws subject matter jurisdiction "*only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves…already have been publically disclosed." *Absher*, 764 F.3d at 708 (emphasis in original) (internal quotation marks omitted). Thus, in the absence of an explicit allegation of fraud, the public-disclosure bar "may still apply so long as…facts establishing the essential elements of fraud—and, consequently, providing a basis for the inference that fraud has been committed—are in the government's possession or the public domain." *Id.* (internal quotation marks omitted).

*Absher* is the only case in which we have addressed directly the quantum and quality of factual content necessary to expose a transaction as fraudulent and thus trigger the public-disclosure bar. In that case, two former employees of Momence Meadows Nursing Center, Inc. ("Momence") brought a *qui tam* action alleging that the nursing facility had "knowingly submitted thousands of false claims to the Medicare and

---

(applying public-disclosure bar where "[t]he government was…on notice of the possibility of a broader bribe-kickback scheme before [the relator] sued"); *Glaser*, 570 F.3d at 909 (applying public-disclosure bar where "the government was already aware of the possible improprieties in [the defendant's] billing practices").

Medicaid programs in violation of the FCA." *Id.* at 704 (internal quotation marks omitted). On appeal, Momence maintained that § 3730(e)(4) deprived the district court of jurisdiction because "the relators' FCA claims were based extensively upon incidents of non-compliant care documented in government survey reports," which, according to Momence, "tend[ed] to establish one of the essential elements of fraud—namely, that Momence provided non-compliant care to its residents." *Id.* at 708. Rejecting Momence's argument, we held that, although the survey reports did disclose that Momence had, on certain occasions, failed to comply with the required standard of patient care, "the surveys did not disclose facts establishing that Momence misrepresented the standard of care in submitting claims for payment to the government." *Id.* at 708–09. It "is not enough," we explained, that "as soon as the government learned that Momence was providing non-compliant care, it necessarily knew that at least some of Momence's claims for payment were for the provision of non-compliant care." *Id.* at 709 n.10. Rather, "[t]he government must also have access to facts disclosing that [the defendant] had the scienter required by the FCA." *Id.* Because the FCA imposes liability upon "any person who…*knowingly* presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A) (emphasis added), the dispositive question is whether the information disclosed in the Audit Report provides a sufficient basis from which to infer that the CTA "knowingly" sought UAFP grant funding from the FTA on a false basis.

Relying on *Absher*, Cause of Action now contends that it would be "unreasonable to infer" from the Audit Report that

the CTA possessed the scienter required by the FCA.[15] We disagree. In *Absher*, the facts in the public domain were government survey reports detailing instances of Momence's noncompliant care. We rejected the proposition that these regulatory violations necessarily implied that Momence *knowingly misrepresented* the level of care it provided when it submitted claims for reimbursement. *Absher*, 764 F.3d at 709 n.10. We held that the public-disclosure bar removes jurisdiction only where one can infer, as a direct and logical consequence of the disclosed information, that the defendant knowingly—as opposed to negligently—submitted a false set of facts to the Government. However, it does not necessarily withdraw jurisdiction over cases where, in order to infer the presence of scienter, one must disregard an equally plausible inference that the defendant was merely mistaken and thus lacked the knowledge required by the FCA. *See United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 867 (7th Cir. 2011) ("[A]lthough bills for services never performed likely reflect fraud, miscoded bills need not; the errors may have been caused by negligence rather than fraud (which means intentional deceit)."). *Absher* presented the latter scenario; the regulatory scheme required Momence to make qualitative judgments about its "compl[iance] with a wide variety of regulations and standards of care." 764 F.3d at 703. Thus, one could no sooner have inferred from the regulatory violations that Momence *knowingly misrepresented* its level of care in seeking reimbursement than one could have inferred that Momence

---

[15] Appellant's Br. 19 n.21.

*mistakenly believed* that it was compliant and then later was found to have violated the standard of care.[16]

Here, by contrast, the Audit Report provided a sufficient basis to infer directly that the CTA knew it was presenting a false set of facts to the Government. Unlike *Absher*, the regulatory scheme here does not involve any qualitative judgments. The CTA is required by statute to submit its transit data to the NTD annually in order to secure grant funding under the UAFP. *See* 49 U.S.C. § 5335(b). The statute and the applicable NTD regulations permit the CTA to receive UAFP grants from the FTA for VRM (vehicle revenue miles). *See id.* § 5336(c)(1)(A)(i). The definition of VRM explicitly excludes deadhead miles. Nat'l Transit Database, 2006 Urbanized Area Reporting Manual, Glossary 384, 396 (2006), *available at* http://www.ntdprogram.gov/ntdprogram/pubs/ARM/2006/ pdf/2006_Reporting_Manual_Glossary.pdf. The Audit Report disclosed that the CTA was reporting VRM data to the NTD that was considerably and consistently higher than that of its peer group. The Audit Report disclosed further that the IL-AG suspected that the CTA was incorrectly classifying deadhead miles as VRM, a direct contravention of the NTD definitions that would necessarily increase the CTA's UAFP grant allocations. From this report, one could infer that the CTA was knowingly misrepresenting deadhead miles as VRM in its NTD reporting data and thus committing fraud

---

[16] *See United States ex rel. Bellevue v. Universal Health Servs. of Hartgrove Inc.*, No. 11 C 5314, 2015 WL 1915493, at *6–7 (N.D. Ill. Apr. 24, 2015) (distinguishing *Absher* based on the qualitative nature of the judgments involved).

against the FTA, rendering a *qui tam* suit unnecessary.[17] Because the NTD regulations specifically proscribe the classification of deadhead miles as VRM, it was not equally plausible to infer from the Audit Report that the CTA mistakenly believed otherwise. Indeed, Cause of Action's theory of the case is that the CTA could not have acted negligently in overstating its VRM because "[w]hen [the] CTA certified its VRM data it included miles that were plainly not allowable."[18]

---

[17] At oral argument, counsel for Cause of Action also contended that the Audit Report could not have provided a sufficient basis to infer fraud because although it detailed the VRM reporting data it did not reference the relevant FTA funding program. In this context, we do not believe that it is necessary for a disclosure to specifically reference a particular program in order for the federal government to infer that it is being defrauded. *See Bogina*, 809 F.3d at 370 (applying public-disclosure bar to allegations of fraud involving government health care programs other than those specifically referenced in the public disclosure). In any event, the Audit Report specifically references the CTA's "grant revenue from the FTA Section 5307 program." R.3-4 at 343.

[18] R.55 at 4. We note that the cases on which *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699 (7th Cir. 2014) relied did not expressly require facts disclosing scienter as an essential element providing for the inference of fraud. Those cases held that the inference of fraud "requires recognition of two elements: a misrepresented state of facts *and* a true state of facts." *Springfield Terminal*, 14 F.3d at 655 (emphasis in original); *accord Horizon W. Inc.*, 265 F.3d at 1015. Moreover, they explained that "[k]nowledge of the allegedly misrepresented state of affairs—which does not necessarily entail knowledge of the fact of misrepresentation—is *always* in the possession of the government." *Springfield Terminal*, 14 F.3d at 656 (emphasis in original). Under this reasoning, the present case remains distinguishable from *Absher*. In *Absher*, the Government had knowledge of the allegedly misrepresented state of affairs, namely the facially valid reimbursement claims. 764 F.3d at 708–09. The

**2.**

Having determined that the allegations in Cause of Action's complaint were publicly disclosed in the Audit Report, we proceed to the second step of the § 3730(e)(4) analysis and ask whether Cause of Action's lawsuit is "based upon" those public disclosures.[19] "[A] relator's FCA complaint is 'based upon' publicly disclosed allegations or transactions when the allegations in the relator's complaint are *substantially similar to* publicly disclosed allegations." *Glaser*, 570 F.3d at 920 (emphasis added).[20] We have cautioned against "viewing FCA

---

Government did not, however, know of the true state of facts, *i.e.*, that the claims were for non-compliant care, nor did the survey reports provide such knowledge. *Id.* at 709. Here, by contrast, the Government had knowledge of both elements. Like *Absher*, it had knowledge of the allegedly misrepresented VRM because the data had already been submitted to the NTD. Unlike *Absher*, the Government also had knowledge of the true state of facts, *i.e.*, that the VRM reporting was improperly inflated, because the Audit Report disclosed that the CTA's data was considerably and consistently higher than its peer group and that the IL-AG suspected that the CTA was incorrectly classifying deadhead miles as VRM.

[19] Although the district court concluded that Cause of Action waived argument under the second and third prongs of the analysis, these are matters of law that have been fully briefed and argued and that we review de novo. We therefore exercise our discretion to address them in order to provide a complete analysis. *See Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 749–50 (7th Cir. 1993) (resolving issue not raised in district court where issue was fully briefed and argued and involved a "pure issue of statutory interpretation, as to which the district judge's view…could have no effect on our review").

[20] The 1986 version of the public-disclosure bar precluded *qui tam* actions that were "based upon the public disclosure" of the allegations. *See*

claims at the highest level of generality…in order to wipe out *qui tam* suits." *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013) (internal quotation marks omitted). Nevertheless, in order to avoid the public-disclosure bar, it is essential that a relator present "genuinely new and material information" beyond what has been publicly disclosed. *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935–36 (7th Cir. 2012) (holding that allegations not substantially similar because they "allege[d] a [different] kind of deceit"); *accord United States ex rel. Heath v. Wis. Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014) (holding that allegations not substantially similar because they "required independent investigation and analysis to reveal any fraudulent behavior"); *Leveski*, 719 F.3d at 829–33 (holding that allegations not substantially similar because they covered an entirely different time period, included wrongdoing by a separate department, pertained to a more sophisticated scheme, and named specific individuals); *Baltazar*, 635 F.3d at 867–69 (holding that allegations not substantially similar because relator "supplied vital facts that were not in the public domain").

Cause of Action's allegations are substantially the same as

---

§ 3730(e)(4)(A). This court interpreted "based upon" to mean "substantially similar to" the publicly disclosed allegations. *See Glaser*, 570 F.3d at 920. When Congress revised § 3730(e)(4)(A) to its current form in 2010, it "expressly incorporate[d]" our interpretation. *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 828 n.1 (7th Cir. 2013); *see* 31 U.S.C. § 3730(e)(4)(A) (2012) (requiring courts to dismiss *qui tam* actions where "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed"). Our analysis in this step is therefore the same under either version of the statute. *See Bogina*, 809 F.3d at 368 (describing this shift in language as "not a significant change, both formulas being aimed at barring 'me too' private litigation" (internal quotation marks omitted)).

the information disclosed in the Audit Report. Its complaint provides only two additional pieces of information. First, Cause of Action alleges throughout that the CTA *knowingly* misreported its VRM data to the NTD. Importantly, though, this particular claim is not based on Cause of Action's direct knowledge of the CTA's scienter or lack thereof. Rather, it is an inference drawn from the available facts, and, as discussed above, the Government was in an identical position to infer scienter from the publicly disclosed Audit Report. *See United States ex rel. Bellevue v. Universal Health Servs. of Hartgrove Inc.*, No. 11 C 5314, 2015 WL 1915493, at *7 (N.D. Ill. Apr. 24, 2015). Second, Cause of Action emphasizes that, although the Audit Report analyzed the CTA's transit data for only the years 1999 through 2004, its complaint alleges misreporting that spans a broader timeframe. In this context at least, the allegation of a longer time span does not warrant our characterizing Cause of Action's allegations as not substantially similar to the continuing practice disclosed in the Audit Report.[21] In *Glaser*, we held that the allegations of overbilling in the relator's complaint were "virtually identical" to the wrongdoing that was the subject of the CMS investigation because "they pertain[ed] to the same entity and describe[d] the same fraudulent conduct." 570 F.3d at 920. Although the complaint "add[ed] a few allegations not covered by CMS's investigation," these additions were insufficient to avoid the public-disclosure bar. *Id.* A "*qui tam* action even partly based upon publicly disclosed allegations or transactions," we explained, "is nonetheless 'based upon' such allegations or transactions." *Id.* Here, as in *Glaser*, Cause of Action's allegations per-

---

[21] *See supra* note 14.

tain to the same entity (the CTA) and describe the same allegedly fraudulent conduct (misreporting deadhead miles as VRM to the NTD) as the publicly disclosed information. Without more, we do not believe Cause of Action has presented "genuinely new and material information." *Goldberg*, 680 F.3d at 936.

Cause of Action urges, however, that our decision in *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688 (7th Cir. 2014), requires a different result. In that case, an auditor retained by several Wisconsin school districts to audit telecommunications bills brought a *qui tam* action alleging that defendant Wisconsin Bell was "fraudulently overcharg[ing] school districts, libraries and the United States for telecommunication services." 760 F.3d at 690. These allegations were based on the relator's "extensive review of the charges administered by Wisconsin Bell," and comparisons of the rates paid by the schools to one another and to a publicly available service agreement between Wisconsin Bell and the state. *Id.* at 689, 692. We held that the public-disclosure bar was not triggered because the relator's allegations "required independent investigation and analysis to reveal any fraudulent behavior." *Id.* at 691; *see also United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (1999) (holding public-disclosure bar did not apply where relator "walked the streets" as a "private investigator" observing the school bus operations at issue).

The present case, however, is markedly different from *Heath.* Here, Cause of Action has not conducted any independent investigation or analysis to reveal the fraud it alleges. Mr. Rubin, the author of the Technical Report, provided the details of the CTA's inaccurate reporting to Cause of Action,

who in turn styled them as a complaint with references to the statutes and regulations that support its legal theory of fraud. Because that is the extent of Cause of Action's contribution, "the allegations in [its] complaint are substantially similar to publicly disclosed allegations." *Glaser*, 570 F.3d at 920; *see also United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991) ("[T]he relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation.").

**3.**

Cause of Action could still avoid the public-disclosure bar if it were able to establish that it is "an 'original source' of the information upon which the allegations in [its] complaint were based." *Glaser*, 570 F.3d at 921. To do so, Cause of Action would have to show that it "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and "has voluntarily provided the information to the Government before filing [its] action." 31 U.S.C. § 3730(e)(4)(B) (2012).[22] Cause of Action voluntarily provided the relevant information to the Government when it notified the Department of Justice of the CTA's misreporting in March 2012 before filing suit several months later. However, its knowledge of the CTA's alleged wrongdoing is

---

[22] Because the 2010 amendment to § 3730(e)(4)(B) is "not subject to a retroactivity bar," it applies "regardless of when a person claiming to be an original source acquired his knowledge." *Bogina*, 809 F.3d at 368–69. We therefore use the new statutory language in this step of our analysis.

neither independent of nor materially adds to the publicly disclosed Audit Report.

First, Cause of Action has not established that its knowledge is independent of the publicly disclosed information. To satisfy this requirement, a relator's knowledge of the alleged wrongdoing must not "derive[] from or depend[] upon" the public disclosure. *Bank of Farmington*, 166 F.3d at 864. Instead, the relator must be "someone who would have learned of the allegation or transactions independently of the public disclosure." *Id.* at 865; *compare Glaser*, 570 F.3d at 921 (holding relator was not an original source where her "only knowledge that [the defendant]'s billing practices were improper came from [her attorney], with whom [she] had no prior relationship and who contacted her out of the blue"), *with Leveski*, 719 F.3d at 837 (holding relator was an original source where knowledge was "personal and specific to her; it [wa]s not second- or third-hand evidence learned from another source"). Here, Cause of Action has maintained throughout that it was not until Mr. Rubin provided his Technical Report, the Audit Report, and an affidavit that Cause of Action learned of the CTA's misreporting. Had it not been for Mr. Rubin's overture, there is no reason to believe that Cause of Action would have ever learned of the wrongdoing it now alleges. Second, because Cause of Action's allegations are substantially similar to those contained in the Audit Report, its information has not "materially add[ed]" to the public disclosure. 31 U.S.C. § 3730(e)(4)(B) (2012).

Cause of Action therefore is not an original source of the allegations in its complaint within the meaning of § 3730(e)(4)(B).

## Conclusion

The allegations in this case fall within the public-disclosure bar to the *qui tam* statute, and, therefore, the district court properly dismissed the complaint. The judgment of the district court is affirmed.

AFFIRMED